**THIS ORDER IS SIGNED AND ENTERED.**

Dated: February 16, 2012

_____
**Hon. Robert D. Martin
United States Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

Jonathan L. Graham and
Veronica L. Graham,                                                                              (Chapter 7)

       Debtors.                                                                              Case No. 11-10930

Associated Bank, N.A.,

       Plaintiff.                                                                              Adv. No. 11-00105

v.

Jonathan L. Graham and
Veronica L. Graham,

       Defendants.

MEMORANDUM DECISION

      Jonathan and Veronica Graham ("the debtors") filed a voluntary chapter 7 petition on February 18, 2011. Associated Bank ("the Bank") brought this adversary proceeding, requesting that the amount the debtors spent after the Bank mistakenly deposited it in their account be excepted from discharge under § 523(a)(2)(A) and § 523(a)(6). A trial was held on November 22, 2011.

1

In March 2006, when the debtors opened a personal checking account with the Bank, they signed a Signature Card, agreeing to be bound by the rules regulating the account. The Bank Deposit Account Information Rules include on page 10 thereof:

### Customer's Examination Responsibility

"You must examine your statement of account and report any unauthorized signatures, alterations, other unauthorized transactions, or errors, along with the relevant facts surrounding the same… within [a maximum of 14 days] … Even if timely reported, you may have to bear the loss or share the loss with us if your lack of ordinary care substantially contributed to the loss.

…

If you fail to report any unauthorized…transactions, or errors in your account within 14 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and the loss will be entirely yours. This 14-day limitation is without regard to whether we used ordinary care."

No evidence suggests that the debtors ever read this language. In any event, they failed to report an erroneous deposit made to their account.

The debtors had also opened two accounts with the Bank for their businesses, Sloppy Lobster, Inc. and Quarry Interiors. Veronica Graham ran the day-to-day operations of the businesses. The debtors intermingled funds in their accounts. During the time period relevant to this matter (July 2008 to September 2008), the debtors used money in the personal account to pay business as well as personal expenses.

Jonathan Graham was a Delta Airlines pilot whose salary was deposited in an account at a Delta Community credit union in Atlanta. He also served in the Air Force Reserve. He had returned from serving in Iraq at the end of March 2008, and during August 2008, he was in South Africa. His monthly Reserve pay was deposited in the personal account at the Bank. While activity within this account varied month to month, the deposits typically corresponded with

2

contemporaneous withdrawals in similar amounts. Prior to July 28, 2008, the account balance at the end of each statement period was quite small.

Account activity between July 18 and July 28, 2008 brought the balance in the personal account near zero. The only two deposits made during this period corresponded with two subsequent withdrawals in similar amounts. Other withdrawals were due to overdraft fees and expenses Jonathan incurred while he was deployed overseas.

On July 28, 2008, the Bank erroneously deposited $64,467.67 into the debtors' personal account. On their bank statement, the line item next to this deposit reads "Mark and Lisa Beyer." The debtors do not know Mark and Lisa Beyer. The debtors did nothing to induce or compel this deposit. Transactions for the following day show a deposit in the amount of $276.40 and a withdrawal in the amount of $500.00. Between July 30, 2008 and August 6, 2008, no deposits were made, but over $500.00 was withdrawn. On August 7, 2008, a $200.00 deposit was made, but about $2,000.00 was withdrawn. Account activity between August 8 and August 20 show about $5,300.00 in deposits, and over $18,500.00 in withdrawals. The majority of the withdrawals took place in Wisconsin, but some appeared to have been made by Jonathan overseas. The funds withdrawn were used to pay household and business expenses. No extravagant purchases or diverting deposits were shown to have been made.

Throughout this period, the debtors did not contact the Bank regarding the $64,467.67 deposit. And, they testified that they did not discuss it with one another, because Jonathan's deployment prevented them from regular conversation. They explained that they were expecting inheritance money (possibly as much as $90,000.00) from Jonathan's uncle, and they assumed the deposit was an installment of this inheritance, although they did not necessarily expect to

3

receive the inheritance via wire transfer. Prior to July 2008, the debtors had received an installment of the inheritance by check in the amount of $2,000.00.

The Bank was notified of its error on September 22, 2008, and immediately commenced an investigation. The debtors maintain that they did not learn of the Bank's mistake until a bank representative informed Veronica on September 22 that an error had been made. She replied that they had anticipated an inheritance, and she would be contacting her husband and working with the Bank to resolve the matter. The Bank reversed the errant deposit that day, leaving the account overdrawn by over $61,000.00. The Bank notified the debtors of the deficiency and asked them to replace the funds. The debtors failed to do so, and the Bank incurred the loss. There was no evidence as to whether the loss was insured.

From an affidavit of the debtors which accompanied a motion to dismiss this proceeding we learned that:

> In March 2009, the Bank brought a suit against the debtors on two causes of action: Breach of Contract and Misappropriation. It asked for judgment on its first claim in the amount of $60,624.09, plus costs and attorney fees, or "in the alternative, if the Defendants actions are found to be intentional, on its second claim in the amount of $242,496.36…"

In a response brief filed with this court, the Bank explained that:

> After almost two years of litigation in state court, the Bank consented to dismissal of the Misappropriation claim without prejudice. The debtors had informed the Bank that they intended to file bankruptcy, and the Bank voluntarily dismissed the Misappropriation claim so it could obtain summary judgment on the

4

breach of contract claim in the amount of $65,425.09 ($60,624.09, plus costs and attorney fees). There was no finding of misappropriation, fraud or intentional injury.

The judgment was not put in evidence at trial, but the facts recited here are not contested.

The Bank commenced this adversary proceeding against the debtors under § 523(a)(2)(A) and § 523(a)(6). It argues that as of July 29, 2011, when she made a $500.00 withdrawal from the account, Veronica Graham not only knew of the $64,467.67 transfer, but knew the transfer was made in error. As stated in its Proposed Findings of Fact, the Bank believes that it is entitled to judgment and an Order of Non-dischargeability in the amount of $60,152.31 - the amount by which the account was overdrawn after the Bank reversed the errant transfer, less $471.46 in overdraft fees and one small withdrawal.

Exceptions to discharge are construed strictly against a creditor and liberally in favor of the debtor. *Westlund v. Casper (In re Casper)*, 440 B.R. 500, 505 (Bankr. W.D. Wis. 2010) (citing *In re Chambers*, 348 F.3d 650, 654 (7th Cir. 2003)). A plaintiff must prove all elements of an exception to discharge by a preponderance of the evidence. *Id*. 11 U.S.C. § 523(a)(2)(A) states: "(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— … (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition…"

In order to except a debt from discharge under § 523(a)(2)(A), a creditor must establish the following elements: (i) that the debtor made a false representation of fact, (ii) that the debtor

5

either knew the representation was false or made the representation with reckless disregard for its truth, (iii) that the representation was made with an intent to deceive, and (iv) that the plaintiff justifiably relied upon the false representation to its detriment. *See Iwaszczenko v. Neale (In re Neale)*, 440 B.R. 510, 521 (Bankr. W.D. Wis. 2010). To succeed under this section, all three ingredients are needed - falsity, fraudulent intent, and reliance. *Bremer Bank, N.A. v. Wyss (In re Wyss)*, 355 B.R. 130, 133 (Bankr. W.D. Wis. 2006). A breach of a contract or a failure to perform some promised act, by itself, will not render a debt nondischargeable under § 523(a)(2)(A). *Christenson v. Lee (In re Lee)*, 415 B.R. 367, 372 (Bankr. E.D. Wis. 2009).

The inquiry under § 523(a)(2)(A) focuses on the manner in which the debtor "obtained" the funds. *Bremer Bank, N.A. v. Wyss (In re Wyss)*, 355 B.R. at 134 (citing *McClellan v. Cantrell*, 217 F.3d 890, 895 (7th Cir. 2000) (the statute requires that "money, property, or services be obtained by fraud")). Subsequent conduct is only relevant to the extent it can illuminate the debtor's behavior at the time the debt was incurred. *Id.* Fraud can be found in an express misrepresentation or failure to disclose a material fact:

> Actual fraud precluding discharge consists of any deceit, artifice, trick or design, involving the direct and active operations of the mind used to circumvent or cheat another; something said, done or omitted with the design of perpetrating what is known to be a cheat or deception. However, fraud may consist of silence, concealment or intentional non-disclosure of a material fact, as well as affirmative misrepresentation of a material fact. *Christenson v. Lee (In re Lee)*, 415 B.R. at 371-372 (citing *In re Faulk*, 69 B.R. 743, 750 (Bankr. N.D. Ind. 1986) (internal quotes and citations omitted)).

Still, an omission traditionally must induce the obtaining of the money. In *Christenson*, by not disclosing that the firearms were nontransferable, the debtor induced Christenson into a purchase transaction. *Id.* at 373-74. Christianson relied on this non-disclosure to his detriment, as he paid significant sums of money for guns that he never obtained. *Id.* at 374.

6

The parties agree that the debtors did nothing fraudulent (indeed, nothing at all) to bring about the $64,467.67 transfer to their account. The transfer was the Bank's error. Neither an act nor an omission by the debtors induced the Bank to make the deposit. Even if the debtors had been aware of their contractual duty to report errors, breach of a contractual duty alone is not enough to except a debt from discharge under this section.

The debtors' use of the funds does not constitute a false statement for the purposes of § 523(a)(2)(A). Checks are not factual assertions, and therefore cannot be characterized as true or false statements. *Williams v. U.S.*, 458 U.S. 279, 284-285, 102 S.Ct. 3088, 3091-92 (1982); *see also Capital One Bank v. Bungert (In re Bungert)*, 315 B.R. 735, 738-739 (Bankr. E.D. Wis. 2004). If a check or withdrawal was a representation, it was one made to the designated payee and represented at most that the payee would receive funds from the account. The Bank might have protected itself from loss by not honoring checks written on the account, but it had a contractual duty of its own to pay its obligation to the debtors represented by the checks and electronic withdrawals. Because the money was not "obtained" by false pretenses, the elements of § 523(a)(2)(A) have not been met.

11 U.S.C. § 523(a)(6) states: "[a] discharge under section 727… does not discharge an individual debtor from any debt—for willful and malicious injury by the debtor to another entity or to the property of another entity." In order for a debt to be excepted from discharge under this section, a court must find the injury to be both willful and malicious. *See In re Kimzey*, 761 F.2d 421, 424 (7th Cir. 1985). To succeed, the plaintiff must show that the debtor intended to and caused an injury to the plaintiff or the plaintiff's property. *In re Neale*, 440 B.R. 510, 520 (Bankr. W.D. Wis. 2010) (citing *Zamora v. Jacobs (In re Jacobs)*, 403 B.R. 565, 581 (Bankr. N.D. Ill. 2009)). Because a person will rarely admit to acting in a willful and malicious manner,

7

the requirements may be inferred from the circumstances surrounding the injury. *Weinberger v. AnchorBank*, No. 10-C-0996 2011 WL 679343, *5 (E.D. Wis. Feb. 16, 2011) (citing *Kawaauhau v. Geiger (In re Geiger)*, 523 U.S. 57 (1998)).

"Willful" means deliberate or intentional. *Kawaauhau v. Geiger*, 523 U.S. at 61. Willfulness requires more than just negligence, or even recklessness. *Id*. The creditor must prove that the debtor subjectively intended to injure it or knew that injury was "substantially certain" to result. *In re Neale*, 440 B.R. at 520. "Malicious" means "in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. Ill. 1994). This court has required that "the debtor know that his act will harm another and proceed in the face of that knowledge." *In re Jorenby*, 393 B.R. 663, 666 (Bankr. W.D. Wis. 2008). Tortious conversion is included only generally in § 523(a)(6) of the Bankruptcy Code. *First Weber Group, Inc. v. Horsfall (In re Horsfall)*, No. 10-179, 2011 Bankr. LEXIS 1729, *10 (Bankr. W.D. Wis. Apr. 26, 2011); *see also Kawaauhau v. Geiger*, 523 U.S. at 61-62. But it is generally acknowledged to be a proper basis for nondischargeability. *Id*.

No controlling decisions, and none from other Circuit Courts of Appeals, address facts similar to those proved in this case, but there are some from other bankruptcy courts. In *In re Nawroz*, the debtor held a certificate of deposit account at Wachovia Securities, with a balance of $28,032.12. *In re Nawroz*, No. 11-0183, 2011 WL 6749064, *1 (Bankr. E.D. Va. Dec. 22, 2011). The debtor requested that Wachovia transfer the funds from the CD account to her retirement account, and Wachovia mistakenly credited her retirement account twice. *Id*. The debtor transferred the entire amount of $56,043.24 to her checking account at a different bank. *Id*. Then she wrote a check in the amount of $81,000.00, which the court noted would not have

8

cleared, but for the mistaken transfer. *Id*. Judge Kenney inferred that the debtor was intentionally using funds that she knew were not hers to spend, and therefore, the debtor's act satisfied the "willful" element of § 523(a)(6). *Id*. at *2. The court also found "malice" was present, as the debtor made a conscious choice to use the funds, rather than to alert Union Bank or Wachovia of the mistake. *Id*. at *3. Thus, "her exercise of dominion and control over funds she knew belonged to another" warranted a finding that the debtor's actions were malicious. *Id*. (citing *First Nat'l Bank v. Stanley (In re Stanley)*, 66 F.3d 664, 668 (4th Cir. 1995)).

In *In re Martin*, the plaintiff mistakenly sent a check to the defendant in the amount of $36,500.00. *In re Martin*, 321 B.R. 437, 439 (Bankr. N.D. Ohio 2004). The plaintiff did not discover the error until all of the funds had been spent. *Id*. The plaintiff commenced an action in state court and obtained a judgment holding the defendant liable for conversion. *Id*. at 440. The bankruptcy court found that the defendant knew he was not the intended recipient of the check, yet he proceeded to negotiate and then dissipate the funds from the check, and that this conduct established "willfulness," as "[t]o hold otherwise, under the conditions just mentioned, would unduly raise the evidentiary bar on an action brought under § 523(a)(6) so as to make it almost impossible, without a direct admission, to establish the "willful" standard of the statute." *Id*. The court noted that malice requires a "heightened level of culpability transcending mere willfulness," and the defendant's conduct established "maliciousness" because he did not intend to confer a benefit on the injured party. *Id*. at 442. He actually attempted to keep the transactions secret (upon receiving the check, the defendant did not deposit it in his normal business account, but instead deposited it in his personal account). *Id*. From that, the court concluded that "[w]hen considered in conjuncture with those circumstances, as previously set forth, demonstrating the willfulness of the Defendant's actions, the weight of the evidence in this

9

case tips heavily toward a finding that the Defendant's actions were taken in conscious disregard of his duties and without just cause or excuse." *Id*. at 442-43.  Accordingly, the court found that the debtor acted both willfully and maliciously, and the state court judgment debt was excepted from discharge under § 523(a)(6). *Id*. at 443.

Conversely, a debt was discharged when an employee received too much for severance pay, but did not report the error.  The debtor was to receive $5,113.00 severance pay from her former employee. *SmithKline Beecham Corp. v. Catherine Lam (In re Catherine Lam)*, No. 06-09096, 2008 Bankr. LEXIS 1372, *2 (Bankr. N.D. Ga. Mar. 27, 2008).  Instead, by dint of clerical error, she received a check from the plaintiff in the amount of $53,932.29, and cashed it. *Id*.  The debtor learned of the plaintiff's error several months later in a letter from the plaintiff's representative. *Id*. at *3.  In ruling for the debtor, the court found that the act of cashing the check was indeed a willful one, but it did not rise to the level of malicious without establishing the requisite intent to injure. *Id*. at *7.  Nothing established that debtor cashed the check to deliberately or intentionally injure the plaintiff. *Id*. at *8.  The court acknowledged the debtor's uncontroverted (and seemingly credible) testimony that she was not aware of the error when she cashed the check. *Id*.

In this case, there is prima facie evidence of a willful act.  The debtors most likely would have been aware of the transfer soon after it occurred.  They usually kept the account balance near zero.  Withdrawals that occurred within the first week of the transfer were relatively small, and some came from overseas.  There is no direct proof that the debtors checked the balance during this period.  But on August 7, 2008, a $200.00 deposit was made, and about $2,000.00 was withdrawn.  Account activity between August 8 and August 20 show about $5,300.00 in deposits, and over $18,500.00 in withdrawals.  The debtors are not likely to have made those

withdrawals without believing there was extra money in the account. So, possibly as soon as August 7, 2008, the debtors knew about the $64,467.67 deposit.

However, such a finding does not in itself establish "willfulness." The debtors must have known that the extra money did not belong to them. The debtors deny having that knowledge, testifying that they believed the $64,467.67 deposit was part of an inheritance. While not rebutted directly, this version of the debtors' state of mind is not easily credited. It is likely that at some point, they were aware they were spending someone else's money. Whether that date is August 7th (when they were probably aware that the deposit had been made) or later, is uncertain.

Even if the debtors knew they were spending someone else's money on August 7th, it may not have been malicious. No evidence supports that the debtors concealed their use of the funds. As is apparent from their bank records, they spent the money at stores such as Menards and Home Depot. Some of the withdrawals were for expenses for their business. The debtors never made a large or disguised withdrawal. However, if the debtors knew they were spending someone else's money, and if they knew they could not replace it, they certainly knew that by spending the funds in the account, an injury would result. Whether they knew who they were injuring is less clear. Was it the Bank, the rightful owner of the funds deposited, or an insurer of either? To succeed under § 523(a)(6) in this district, the plaintiff must show that the debtor intended to and caused an injury *to the plaintiff or the plaintiff's property interests*. *In re Neale*, 440 B.R. at 520 (emphasis added). That element has not been proved by the greater weight of the evidence. While the circumstances suggest each of the elements of § 523(a)(6), alternative explanations are equally probable.

It is the Bank's burden to establish that the debtors knew the money did not belong to them when they spent it. The Bank established they knew about the deposit, but it did not establish that the debtors knew it was not theirs. Nor was it proved that the debtors knew drawing on their personal account would injure the Bank. The burden of proof is "by a preponderance of the evidence." When one inference is as likely as its opposite, that standard is not met.

Although we don't reach the question of "how much" is nondischargeable, it deserves a short note. Courts in the Seventh Circuit have held that only the portion of the debt actually based on willful and malicious injury by the debtor is nondischargeable. *See In re Cox*, 243 B.R. 713 (Bankr. N.D. Ill. 2000). In *Cox*, Judge Schmetterer held that the debtor's "willful and malicious injury" to the creditor's collateral did not provide basis for excepting entire amount of creditor's claim from discharge, but rather, only to the extent that the debtor destroyed the car's retail value through selling its parts. *Id.* at 720. In this case, it is not possible on the evidence presented to trace the transactions and determine when the debtors spent money that they knew was from the subject deposit and when they spent money they deposited themselves. The debtors did spend some of their own money after they became aware of the erroneous deposit. Even if we knew the exact time after which the debtors knew they were spending someone else's money, not all of the Bank's judgment amount would have been tied to that spending. And no means to calculate an exact sum has been provided in the evidence received.

For these reasons, the Bank has failed to prove all required elements for nondischargeability under § 523(a)(2)(A). The Bank has not met its burden of proof to establish a claim for nondischargeability under § 523(a)(6). Therefore, the Bank is not entitled to a judgment of nondischargeability in any amount. It may be so ordered.

# # #